**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ALARM DETECTION SYSTEMS, INC., an Illinois corporation, | |
| Plaintiff, | Case No.: 13 CV 8960 |
| vs. | |
| ALGONQUIN/LAKE IN THE HILLS FIRE PROTECTION DISTRICT and VILLAGE OF ALGONQUIN, a municipal corporation and home rule unit; and CHICAGO METROPOLITAN FIRE PREVENTION, INC., an Illinois corporation, | Judge: |
| Defendants. | |

**COMPLAINT**

Plaintiff Alarm Detection Systems, Inc. ("Plaintiff" or "ADS"), by and through its attorneys, Dykema Gossett PLLC, brings this action against Defendants and states as follows:

**INTRODUCTION AND SUMMARY OF CLAIM**

1.      ADS is a private alarm contractor in the business of installing, maintaining, testing and monitoring its customers fire alarm systems.  ADS brings this action for injunctive relief to restrain the Defendants from excluding ADS from providing fire alarm monitoring (the "Business") to ADS' customers or offering the Business to prospective customers within the boundaries of the District.   Such exclusionary conduct represents unauthorized and non-competitive behavior which: (1) restrains trade in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and (2) transfers, entrenches, and/or otherwise establishes an illegal monopoly, or attempts to do the same, all in violation of Section 2 of the Sherman Antitrust Act,

15 U.S.C. § 2, and Section 7 of the Clayton Act, 15 U.S.C. § 18. Defendants also deprive ADS of its constitutional rights: (1) to enter into contracts with its customers without the interference of governmental entities such as the governmental Defendants as protected by the Contract Clause of the U.S. Constitution (Art. I, Sec. 10) and, (2) to due process and equal protection under the Fourteenth Amendment to the U.S. Constitution by depriving ADS of its property right to fully engage in the Business.

2.      For a number of years, the Algonquin/Lake in the Hills Fire Protection District (the "District") operated the Business in competition with private alarm companies like ADS.

3.      To gain maximum market share for its Business, the District passed an ordinance ("2010 Ordinance") that eliminated all private competition for fire alarm monitoring, making the District the sole provider of the Business and charging District residents a monthly fee for this service that was non-competitive. A true and correct copy of the 2010 Ordinance is attached as Exhibit A.

4.      In 2010, ADS challenged this exact practice by a different Illinois fire district in Federal Court in the case *ADT Security Services, Inc. et al v. Lisle-Woodridge Fire District, et al*, 10 cv-4382 (N.D. Il).

5.      The District Court there ruled that it was illegal for an Illinois fire district to be in the alarm monitoring business, to charge residents for fire alarm monitoring; or to create a governmental monopoly. As a result, the District Court enjoined such conduct by the Lisle-Woodridge Fire District ("Lisle-Woodridge"). *ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.,* 799 F. Supp. 2d 880 (N.D. Ill. 2011) A true and correct copy of this opinion is attached as Exhibit B. This ruling was affirmed in part, with the Seventh Circuit instructing the District Court to modify the scope of relief granted. *ADT Sec. Servs., Inc. v. Lisle-Woodridge*

2

*Fire Prot. Dist.*, 672 F.3d 492 (7th Cir. 2012) ("*ADT I*") A true and correct copy of this decision is attached as Exhibit C.

6.     The District Court later entered a 32 page Modified Permanent Injunction ("Order") barring Lisle-Woodridge from engaging in the Business and restoring the customers to the alarm company plaintiffs there, including ADS. A true and correct copy of the Order is attached as Exhibit D.

7.     In July, 2013, the Seventh Circuit affirmed the Order in a 50 page decision. *ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 724 F.3d 854 (7th Cir. 2013) (*ADT II*) A true and correct copy of this decision is attached as Exhibit E.

8.     In taking over the Business, the District has operated a similar wireless network for fire alarm monitoring to the one found illegal in Lisle-Woodridge.

9.     In light of the Seventh Circuit's decision, the District decided to exit the Business. As noted by the District's Fire Chief, the Seventh Circuit's decision "effectively prohibits the Fire District from continuing to operate the radio frequency fire alarm network it has maintained since 2005." See letter dated October 31, 2013, a true and correct copy is attached as Exhibit F.

10.     Instead of divesting itself from the Business, however, the District has attempted to preserve its governmental fire alarm monitoring operation and monopoly by entering into an intergovernmental agreement ("IGA") with the Village of Algonquin ("Village"), one of the municipalities within the borders of the District ("District Territory"). The purpose of this agreement is to allow the Village to take over the Business within the District Territory. A true and correct copy of the IGA is attached as Exhibit G.

11.     Upon learning that the District and the Village intended to enter into this IGA, an attorney for ADS contacted the Village's attorney to request that the Village reconsider this

3

course of action as it was an illegal monopoly both under *ADT II* and two U.S. Supreme Court decisions, whether operated by the District or the Village. The Village decided to proceed with executing and implementing the IGA. A true and correct copy of this letter is attached as Exhibit H.

12.     This last ditch effort by the Defendants to preserve an illegal operation and monopoly, along with the ongoing exclusion of the private sector, including ADS, from freely competing for the Business, are at the heart of this Complaint

### The Parties

13.     Plaintiff Alarm Detection Systems, Inc. is an Illinois corporation with its principal place of business in Aurora, Illinois. ADS is a licensed private alarm contractor under the provisions of the Private Detective, Private Alarm, Private Security, and Locksmith Act of 2004 (225 ILCS § 447/5-5 *et seq.*) ("Alarm Act") and under this license is authorized to provide fire alarm and burglar alarm services including the Business throughout the state of Illinois.

14.     Defendant Algonquin/Lake in the Hills Fire Protection District is a fire protection district organized under the Illinois Fire Protection District Act, 70 ILCS 705/1 *et seq.* (the "District Act") to provide fire protection within the geographic boundaries of the District ("District Territory"). The District Territory includes portions of the Villages of Algonquin and Lake in the Hills and some unincorporated areas in Kane and McHenry Counties.

15.     Defendant Village of Algonquin (the "Village") is a municipal corporation and home rule unit of government within the state of Illinois. The Village is one of five municipalities that have boundaries within the District Territory.

4

16.     Defendant Chicago Metropolitan Fire Prevention ("Chicago Metro") is an Illinois corporation with its principal place of business in Elmhurst, Illinois. Chicago Metro is a licensed private alarm contractor under the Alarm Act and under this license is authorized to provide fire alarm and burglar alarm services, including the Business, throughout the state of Illinois

### Jurisdiction and Venue

17.     The Claims in Counts I-III are all based on federal antitrust claims under the Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§1 and 2, or Section 7 of the Clayton Act, 15 U.S.C.§18, which are authorized under §§4 and 16 of the Clayton Act, 15 U.S.C.§§15 and 26; or on federal constitutional issues relying on causes of action authorized under the Civil Rights Act, 42 U.S.C. §1983. Therefore, this Court has federal question jurisdiction under 28 U.S.C. § 1331 and/or jurisdiction under 28 U.S.C. § 1337. The remaining claim for declaratory relief that the District and Village exceeded their  authority under state law is based on this Court's supplemental jurisdiction under 28 U.S.C. §1367.

18.     Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391, as the Defendants reside in the Northern District of Illinois; ADS resides and does business in the Northern District of Illinois; the actions complained about occurred in the Northern District of Illinois; and the likely witnesses necessary for this case generally reside in the Northern District of Illinois.

### HISTORY OF FIRE ALARM MONITORING IN ILLINOIS AND THE DISTRICT

19.     A number of national and local private alarm contractors, licensed by the state of Illinois under the Alarm Act, compete to provide fire alarm services including the sale or lease, installation, maintenance, and monitoring of fire alarm systems within the state.

5

20.     In most local jurisdictions within the Chicago Metropolitan Area, ADS installs, services, tests and monitors fire alarm systems in commercial and multi-family buildings required to have fire alarm systems by local building or fire codes ("Commercial Accounts").

## BACKGROUND FACTS

21.     Since 1968, ADS has been a full service private alarm contractor offering, *inter alia*, sales and installation of fire alarm systems, maintenance and testing of such systems, and the monitoring of such systems through its central station.

22.     ADS provides its services to Commercial Accounts throughout the Chicago Metropolitan Area, parts of downstate Illinois, and other states.  Within the state of Illinois, ADS interacts with over one hundred (100) fire departments, encompassing numerous fire protection districts.  ADS has a number of Commercial Accounts in the District Territory, but cannot provide such customers with the Business due to the 2010 Ordinance and now the implementation of the IGA.

### National Fire Alarm Standards and Operation of Fire Alarm Systems

23.     Fire alarm systems are generally required to meet standards outlined in the National Fire Protection Association's National Fire Alarm and Signaling Code ("NFPA 72" or "NFPA Standards").  The NFPA Standards are nationally recognized standards promulgated by an association that represents governmental entities, testing laboratories, the alarm industry, and other stakeholders.

24.     The NFPA Standards are generally treated as a primary source of standards for fire prevention across the country, which outline standards for, *inter alia*, fire alarm signal transmission equipment and fire alarm monitoring.

6

25.     Pursuant to the District Act (70 ILCS § 705/11), Illinois fire protection districts are authorized to adopt fire prevention codes that parallel national standards. The District has adopted the NFPA Standards and is bound to follow these requirements.

26.     The Village has elected to adopt the NFPA Standards as part of its building code.

27.     Commercial Accounts in the District are required to have fire alarm systems that meet NFPA Standards. A fire alarm system installed in a Commercial Account generally includes an alarm panel, smoke and heat detectors, and a transmission device that sends any signals to either a central station or a remote supervising station.

28.     These alarm systems generate alarm, trouble, and supervisory signals. Alarm signals indicate the possibility of a fire at the premises of a Commercial Account. Trouble and supervisory signals indicate either malfunctions of the system or some activation of a monitored device (e.g., boiler temperature).

29.     Private alarm contractors like ADS use either their own central stations or third party monitoring facilities to address trouble and supervisory signals in order to ensure that Commercial Accounts' fire alarm systems are kept in working order.

30.     Central stations retransmit alarm signals to the Public Safety Answering Points (911 centers) which dispatch emergency personnel and equipment.

31.     The NFPA Standards recognize central station monitoring as the preferred means of monitoring fire alarm signals.

32.     NFPA Standards allow for several different types of transmission devices to be used in fire alarm systems, including dedicated phone lines ("direct wire"), dual digital dialers (regular phone lines), wireless transmitters (radio and cellular devices), and IP transmitters (Internet Protocols).

7

33.     NFPA Standards put the responsibility on the owner of the premises, here Commercial Accounts, to handle all decisions regarding the fire alarm system in their premises, including the selection of a transmission device and the inspection, maintenance, and testing of that device.

34.     The Ordinance usurps this responsibility by having the District control the ownership, inspection, maintenance and testing of the transmission device in contravention of NFPA Standards.

35.     In 1997, ADS began using wireless transmitters (also known as "radio transmitters") manufactured by AES Corporation as a new transmission technology in place of phone lines to transmit fire alarm signals for some Commercial Accounts. ADS now operates one of the largest radio transmission systems in the country, monitoring over seven thousand (9,000) radio transmitters.

36.     ADS uses its central station, which meets NFPA Standards, to monitor fire alarm systems. Central stations monitor millions of customers across the United States, including thousands of Commercial Accounts in the Chicago area.

37.     In the vast majority of communities throughout the United States, central stations provide the sole means of monitoring fire alarm systems. Generally, in only some governmental units in Illinois and rural Connecticut, like the District and now the Village, are governmental units providing monitoring for Commercial Accounts.

## THE RELEVANT MARKET

38.     The anticompetitive behavior initiated by the District and Chicago Metro had a relevant geographic market of the District Territory.

8

39.     The District and the Village entered into the IGA in order to transfer the Business from the District to the Village and continue to bar private alarm contractors from engaging in the Business, other than the installation and servicing functions provided by Chicago Metro to the District and now the Village.

40.     The relevant product market affected by Defendants' anticompetitive conduct is the Business.

41.     The relevant geographic market and relevant product market are collectively referred to herein as the Relevant Market.

## INTERSTATE COMMERCE

42.     The District's and Chicago Metro's anticompetitive activities and those same activities that the Village contracted to undertake under the IGA have impacted or will impact the substantial and uninterrupted flow of products, services, contracts, and claims in interstate commerce and the transfer of substantial sums of money across state lines. In particular, the sale of fire alarm monitoring, including central station monitoring, and other fire alarm services, as well as the equipment and products attended thereto, are all undertaken across state lines as both local and national companies compete for all alarm business including the Business.

43.     Additionally, commercial fire alarm transmission and monitoring services in the District and Village are sold in interstate commerce. Defendants' actions substantially adversely impact the flow of such interstate commerce by, among other things, substantially impacting the price, quantity and availability of services in the Relevant Market.

9

## BARRIERS TO ENTRY ESTABLISHED BY THE DISTRICT

44.     Industry-wide, Commercial Accounts contract for fire alarm monitoring and other alarm services by entering into agreements ("Customer Contracts") with fire alarm monitoring companies, including ADS. These Customer Contracts typically have a multi-year term. Such agreements are automatically renewable and remain in force unless terminated by either party.

45.     The District's Subscriber Agreements are functionally equivalent to Customer Contracts. However, rather than having a fixed term, these Subscriber Agreements are perpetual, subject to the right to terminate on 60 days' notice. A true and correct copy of a Subscriber Agreement is attached as Exhibit I.

46.     Usually, Commercial Accounts seek all their fire alarm system needs from a single vendor. The private alarm contractor which installs a fire alarm system is likely to provide maintenance, testing, and monitoring.

47.     Private alarm contractors like ADS enjoy long-lasting relationships with their Commercial Accounts, which are typically memorialized in Customer Contracts that contain provisions for automatic renewals in order to maintain consistent fire alarm monitoring service.

48.     In contrast, where all Commercial Accounts, including those which have Customer Contracts with ADS or other private alarm contractors for services other than the Business, have been required to sign Subscriber Agreements with the District for the Business, it is virtually impossible for new participants, or those who have previously been excluded, to gain a foothold in the Relevant Market to engage in the Business.

49.     As part of the IGA, the District assigned its interest in its Subscriber Agreements for 441 Commercial Accounts to the Village. In effect, the District is not exiting the Business but simply transferring it to its nominee, the Village.

10

50.     This improper transfer of the District's monopoly to the Village through the IGA will perpetuate an insurmountable barrier to entry into the Relevant Market due to the Village's resulting assumption of performance of the Business to all the transferred Commercial Accounts.

51.     As the Village is merely facilitating this arrangement without performing any services under the IGA, it has arranged to have Southeast Emergency Communications ("SEECOM"), a 911 center, provide all the monitoring of the signals generated by the fire alarm systems at the Commercial Accounts being served under the Subscriber Agreements, just as such monitoring had been done when the District operated the Business.

52.     SEECOM is not a separate legal entity as there is no state statutory scheme establishing such an entity.

53.     SEECOM is merely an "intergovernmental cooperative venture" set up by the Village, the Village of Cary, and the City of Crystal Lake. This arrangement is memorialized in the SEECOM Alarm Monitoring Services Agreement ("SEECOM Agreement"). A true and correct copy of the SEECOM Agreement is attached as Exhibit J. As such, SEECOM acts as the alter ego of the Village in this monitoring scheme.

54.     In spite of this arrangement under the IGA, the District remains the sole entity responsible for fire protection services including firefighting within the District Territory as authorized under the District Act. Such authority does not extend to fire alarm monitoring.

### ANTICOMPETITIVE BEHAVIOR IN THE RELEVANT MARKET

55.     Historically, the District allowed fire alarm monitoring to be provided by means of a direct wire board to receive signals transmitted by means of dedicated telephone lines, with such systems operated by private alarm contractors.

11

**The District's Anticompetitive 2005 Ordinance**

56.     In 2005, the District adopted an ordinance (the "2005 Ordinance") that required all Commercial Accounts (all of which were or could have been potential customers for ADS) to obtain fire alarm monitoring from the District by means of wireless transmitters that had to be owned by, and leased from, the District, and that could only be monitored by the District. A true and correct copy of the 2005 Ordinance is attached as Exhibit K.

57.     The 2005 Ordinance contained a grandfather clause that allowed Commercial Accounts using direct wire transmission devices provided by private alarm companies to continue with this service.

58.     The 2005 Ordinance required Commercial Accounts using the District's monitoring to enter into a contract with the District ("Subscriber Agreement I") to lease the transmitters and obtain monitoring at a cost of $70 per month. See Subscriber Agreement I attached as Exhibit I.

59.     ADS regularly offered monitoring to its similarly situated customers for substantially less than the District charged Commercial Accounts, often for as little as $5 per month.

60.     To implement the 2005 Ordinance, the District entered into a contract with Chicago Metro ("2005 Contract") to purchase wireless transmitters and receiving equipment in order to take over the Business from private alarm contractors and set up the District's own wireless network. A true and correct copy of the 2005 Contract is attached as Exhibit L.

61.     The District entered into an agreement with SEECOM to monitor the Commercial Accounts on the District's wireless network.

LISLE\152583.1
ID\BLGO - 089112\0999

62.    The 2005 Ordinance prohibited all private alarm contractors from competing for new Commercial Accounts, giving the District one hundred percent (100%) of the new Business in the District Territory. This decreased the options available to Commercial Accounts and increased the prices they had to pay for the Business in order to comply with the requirement of using wireless transmitters.

**The District's 2010 Ordinance Establishes a Complete Monopoly**

63.    In 2010, the District positioned itself to establish a complete monopoly over the Business in the District Territory by adopting the 2010 Ordinance, which superseded the 2005 Ordinance (the 2009 and 2010 Ordinances are collectively referred to as the "Ordinances").

64.    The 2010 Ordinance eliminated the grandfather clause which allowed direct wire monitoring by private alarm companies in the Business.

65.    The 2010 Ordinance eliminated any choice in the Relevant Market by mandating that all Commercial Accounts had to use Keltron wireless transmitters owned by and leased from the District, and fire alarm monitoring provided by the District.

66.    The 2010 Ordinance required all Commercial Accounts to enter into a new contract with the District ("Subscriber Agreement II") to lease the transmitters and obtain monitoring at a cost of $80 per month. A true and correct copy of Subscriber Agreement II is attached as Exhibit M.

67.    In addition, such Commercial Accounts had to pay $298 for installation of the wireless transmitter (or an unspecified higher amount if the installation was not routine).

68.    ADS regularly offered monitoring to similarly its situated customers for substantially less than the District charged Commercial Accounts.

13

69.    To implement the 2010 Ordinance, the District entered into a contract ("2010 Contract") with Chicago Metro to supply all the wireless transmitters and receiving equipment necessary to serve all the Commercial Accounts and install and maintain such equipment. A true and correct copy of the 2010 Contract is attached as Exhibit N.

70.    The 2010 Contract is consistent with a business model set out in a dealer agreement ("Keltron Dealer Agreement") between Chicago Metro and Keltron Corporation ("Keltron') which encourages Keltron's dealers like Chicago Metro to enter into agreements with fire districts and municipalities to supply wireless transmitters and receiving equipment manufactured by Keltron to achieve 100% market share. A true and correct copy of the Keltron Dealer Agreement is attached as Exhibit O.

71.    The 2010 Contract obligated the District to buy such Keltron equipment to support its takeover of the Business in the District Territory.

72.    As a result of the 2010 Ordinance and the Contract, all Commercial Accounts had to obtain wireless transmitters and monitoring services from the District as the sole provider, with Keltron as the sole source of equipment, and Chicago Metro as the sole installer and servicer.

73.    To implement the 2010 Ordinance, the District purchased additional Keltron wireless transmitters and receiving equipment from Chicago Metro so that the District could monitor the fire alarm systems of all the Commercial Accounts that were not already being monitored in order to take over the entire Relevant Market and preclude private alarm companies, including ADS, from competing in the Relevant Market for the Business.

14

74.     Effectively, by fiat, the District established a monopoly for itself in the Relevant Market in 2010. This newly self-created monopoly eviscerated any form of competition in the Relevant Market.

75.     As a result of the adoption and implementation of the 2010 Ordinance, the District's share of the Relevant Market approached one-hundred percent (100%).

76.     The adoption and implementation of the 2010 Ordinance resulted in the reduction of the market share of all private participants in the Relevant Market, including ADS, to approximately zero percent (0%).

77.     The District then operated a monopoly over consumers in the Relevant Market.

78.     After the passage and implementation of the 2010 Ordinance, the District was able to charge Commercial Accounts monopoly prices that were substantially higher prices than private competitors were able to offer for similar services, such as those offered in other areas where free and open competition existed.

79.     Commercial Accounts were unable to negotiate prices or services for fire alarm monitoring in the District, as the District dictated equipment, price and terms by the 2010 Ordinance and controlled the Relevant Market through mandatory Subscriber Agreements.

**The Impact of the Lisle-Woodridge Cases on the District's Takeover of the Business**

80.     On February 28, 2012, the Seventh Circuit found that provisions in an ordinance adopted and implemented by the Lisle-Woodridge to take over the Business in that district exceeded the authority given to fire protection districts under the District Act. The Court characterized this takeover as an "illegal monopoly." *See ADT I*, 672 F.3d at 495

15

81.     In August, 2012, Judge Shadur entered the Order requiring Lisle-Woodridge to exit the fire alarm monitoring market and concluding that the district's actions constituted an illegal monopoly. See Exhibit D.

82.     In affirming the Order, the Seventh Circuit ruled that Lisle-Woodridge's actions were beyond its legal authority and "anti-competitive." *ADT II*, 724 F.3d at 858, 873-876.

83.     Although the District Act authorizes the District to acquire and maintain fire stations, facilities, vehicles, apparatus, and equipment for the prevention and control of fire, it provides no express authority for the District to purchase and operate fire alarm transmission and monitoring equipment in order to exclude licensed private alarm contractors, including ADS, from the Relevant Market. See Exhibit D (Order at 26 & 28) and Exhibit E (*ADT II* at 863).

84.     Like the Ordinances here, the Lisle-Woodridge ordinance analyzed in *ADT I* and *ADT II* "attempted to overhaul alarm signaling and monitoring" in a fire protection district by requiring "all commercial property owners to terminate their contracts with private alarm companies and instead to adopt and pay for an alarm and monitoring system provided by the district." *ADT II* at 859.

85.     The Seventh Circuit explained that the "more dramatic effect of the challenged [o]rdinance was to make the [Lisle-Woodridge] District . . . the exclusive provider and servicer of the necessary equipment." In flatly rejecting Lisle-Woodridge's authority to pass such an ordinance, the Seventh Circuit explained that "[n]either the NFPA code nor the [District Act] even tacitly endorses so drastic a policy change as the establishment of a *local governmental monopoly* over fire alarm transmitter devices. In view of fire protection districts' limited powers, *supplanting a competitive private market* is far too significant a change to infer from statutory silence." *ADT I* at 503 (emphasis added), Exhibit C.

16

86.     In *ADT II*, the Seventh Circuit explained that, like the challenged ordinance here, an ordinance "[e]xcluding alarm companies from the monitoring business or making it unduly burdensome for them to participate raises significant concerns about the anti-competitive effects of [that ordinance] . . . ."[1] *ADT II* at 865, Exhibit E.

87.     The District's takeover of the Business is basically the same type of conduct ruled illegal and enjoined by Judge Shadur and upheld by the Seventh Circuit.

**District Concludes its Business Scheme is Illegal and Transfers its Monopoly to the Village**

88.     Shortly after the decision in *ADT* II, the District considered two options for exiting the Business: (1) Sell its assets used in the Business and open up the District Territory to free competition among private alarm contractors; or (2) Transfer ownership of the Business to the Village and continue to control the Business. See Village's Fire Chief Letter dated October 31, 2013, Exhibit F, at pp.3-4.

89.     On November 19, 2013, the Village passed resolution 2013-R-47 ("Resolution") authorizing the entry into the IGA to take over the Business in the District Territory from the District. A true and correct copy of the Resolution is attached as Exhibit P.

90.     Pursuant to the IGA, the District intends to sell all its wireless transmitters in the premises of Commercial Accounts and receiving equipment at the District to the Village for only $1. See Exhibit G, IGA, Section 2.a.

91.     Pursuant to the IGA, the Village took ownership of the equipment and thus the Business effective December 1, 2013.

---

[1] The Court specifically found that (1) fire alarm monitoring was not authorized by the District Act; (2) the district could not charge its residents for any fire protection service, including fire alarm monitoring; and (3) the system in place was not parallel to national standards as required by the District Act. The Court noted in numerous comments that this Business was an inhibition to free competition. *ADT II* at 861-65, 875, Exhibit E.

17

92. The Village has thus acquired from the District an illegitimately attained monopoly with unfettered and uncontested access to hundreds of radio transmitters already installed on the walls of the Commercial Accounts.

93. No private alarm company, including ADS, can compete in the Relevant Market as all the Commercial Accounts are already bound by Subscriber Agreements II with open-ended terms.

94. Chicago Metro continues to service this monitoring system, even though the Village is now the titular owner and operator.

95. The radio transmitters supplied by the District to the Village are Keltron branded products manufactured by AES Corporation and private labeled to Keltron.

96. While the Village acquired 441 transmitters and related receiving equipment under the IGA for only $1 in total, ADS has to purchase the same radio transmitters directly from AES Corporation for four hundred and fifty dollars ($450) per unit.

97. The Keltron transmitters and the AES transmitters are identical, except for their labels.

98. Factoring in the costs of purchasing and installing the equivalent radio transmitters to make it technically possible for ADS or any other private alarm company to compete in the Relevant Market, the Village's acquisition of the same assets for effectively no cost creates an insurmountable barrier to entry.

**The Village has no Authority to Take Over the Business**

99. Neither the Illinois Municipal Code, nor the Village's home rule power granted by the Illinois Constitution, contain any specific grant of authority to allow the Village to

18

monopolize the Business, and there exists no basis at law which would otherwise authorize the Village to establish a monopoly in the Business.

100.    The takeover of the transmission end of the Business is contrary to NFPA Standards.

101.    Any provider of fire alarm services, including the Business, must be licensed by the state of Illinois under the Alarm Act.

102.    Neither the District nor the Village holds licenses under the Alarm Act.

### COUNT I – VIOLATION OF SHERMAN ACT § 1 –
### (Contract or Combination in Restraint of Trade)

103.    ADS realleges and incorporates by reference paragraphs 1 through 102 as though fully set forth herein.

104.    The Defendants have combined, conspired and contracted, through the anticompetitive means described above, to restrain trade and commerce among the several states and to suppress and prevent competition in the Relevant Market in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

105.    The combinations, conspiracies and contracts entered into between and among the District and the Village were undertaken with the express purpose and intent of unlawfully restraining competition, and thereby excluding ADS and other potential market competitors from the Relevant Market.

106.    The District and the Village's anticompetitive agreements, schemes, acts, and practices described herein have substantially and adversely impacted and unreasonably restrained, and continue to substantially and adversely impact and restrain, interstate commerce in the Relevant Market.

19

107.     No valid reasons exist for the District and the Village's anticompetitive agreements, schemes, acts and/or practices.

108.     As a direct and proximate result of the District and Village's unlawful conduct as described herein, ADS has previously suffered and will continue to suffer economic injury and damage in its business, property, and other economic interests in an amount difficult to determine given the absolute exclusion of competition created by the District and transferred to the Village.

109.     The District and the Village are immune from antitrust damages under the Local Government Antitrust Immunity Act, 15 U.S.C. §§34-36, and therefore ADS has no adequate remedy at law against the District or the Village.

110.     Unless enjoined immediately, the District's transfer of the assets used in the Relevant Market, including the assignment of Subscriber Agreements II, to the Village will cause irreparable harm and damage to ADS and the general public, for which ADS and the general public have no adequate remedy at law.

WHEREFORE, Plaintiff moves this Honorable Court for the following relief:

1.     A declaratory judgment that the 2010 Ordinance, 2010 Contract, and the IGA violate ADS's rights under Section 1 of the Sherman Act;

2.     An order preliminarily and permanently enjoining the Defendants from engaging in the Business;

3.     An order preliminarily and permanently enjoining the District and Village from transferring the Business from the District to the Village and requiring the District and/or the Village to completely divest themselves from the Business in a manner that will ensure that all

LISLE\152583.1
ID\BLGO - 089112\0999

private alarm contractors in the Business will be able to freely and openly compete for Commercial Accounts in the Relevant Market and that the provider in the Business selected by such Commercial Accounts;

4.      An award of costs and reasonable attorney's fees as authorized under 15 U.S.C. § 15(a); and,

5.      Such other relief as this Court may deem just and reasonable.

## COUNT II – VIOLATION OF SHERMAN ACT § 2 –
### (Unlawful Monopolization, Attempted Monopolization and Conspiracy to Monopolize)

111.      ADS realleges and incorporates by reference paragraphs 1 through 102 as though fully set forth herein.

112.      The Defendants' anticompetitive conduct, agreements, schemes, acts and practices constitute intentional and unlawful monopolization of interstate trade and commerce in the Relevant Market, and the intentional and unlawful maintenance and use of monopoly power in the Relevant Market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

113.      The Defendants' anticompetitive conduct, agreements, schemes, acts and practices constitute intentional and unlawful attempted monopolization of interstate trade and commerce in the relevant market defined above, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

114.      The Defendants have acted with the specific intent to attempt to monopolize the Relevant Market, and have sufficient market power to create a dangerous probability of success of monopolizing the Relevant Market.

LISLE\152583.1
ID\BLGO - 089112\0999

115.    Additionally, the Defendants' active participation in various agreements and combinations constitutes a conspiracy to monopolize the Relevant Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

116.    The Defendants have excluded, or attempted to exclude, competition in the Relevant Market by preventing or impeding competition in the Relevant Market.

117.    As described above, the acquisition or attempted acquisition of a monopoly in the Relevant Market has been secured by illegal means.

118.    The Defendants' anticompetitive conduct, agreements, schemes, acts and practices have injured competition and consumers in the Relevant Market by eliminating all competition in the Relevant Market and increasing prices to customers.

119.    As a direct and proximate result of the Defendants' unlawful conduct as described herein, ADS has suffered economic injury and has been damaged in its business, property, and other economic interests in an amount difficult to determine given the absolute exclusion of competition created by the District with Chicago Metro and transferred to the Village.

120.    The District and the Village are immune from antitrust damages under the Local Government Antitrust Immunity Act, 15 U.S.C. §§34-36, and therefore ADS has no adequate remedy at law against the District or the Village.

121.    Unless enjoined immediately, the District's transfer of the assets used in the Relevant Market, including the assignment of Subscriber Agreement IIs, to the Village and Chicago Metro's servicing of this wireless network, and the continued monopolization, attempted monopolization, and conspiracy to monopolize the Relevant Market will cause irreparable harm and damage to ADS and the consumers in the Relevant Market, for which ADS and such consumers have no adequate remedy at law.

22

WHEREFORE, Plaintiff moves this Honorable Court for the following relief:

      1.     A declaratory judgment that the 2010 Ordinance, the Contract, and the IGA violate ADS's rights under Section 2 of the Sherman Act;

      2.     An order preliminarily and permanently enjoining the Defendants from engaging in the Business.

      3.     An order preliminarily and permanently enjoining the District and Village from transferring the Business from the District to the Village, requiring the District and/or the Village to completely divest themselves from the Business in a manner that will ensure that all private alarm contractors in the Business will be able to freely and openly compete for Commercial Accounts in the Relevant Market and that Commercial Accounts will have the benefits of free competition in their selections of private alarm companies, including ADS, to provide them with the Business;

      4.     An award of costs and reasonable attorney's fees as authorized under 15 U.S.C. §15(a); and,

      5.     Such other relief as this Court may deem just and reasonable.

## COUNT III– VIOLATION OF CLAYTON ACT § 7 –
### (Acquisition Lessening Competition and Creating a Monopoly)

      122.     ADS realleges and incorporates by reference paragraphs 1 through 102 as though fully set forth herein.

      123.     The activities of the Defendants have impacted the substantial and uninterrupted flow of products, services, contracts, and claims in interstate commerce and the transfer of substantial sums of money across state lines. Both are involved in activities affecting commerce in the United States.

LISLE\152583.1
ID\BLGO - 0891112\0999

124.     The Village's acquisition of the fire alarm monitoring business including the wireless transmitters in Commercial Accounts and receiving equipment from the District, as well as the assignment of Subscriber Agreement IIs, are asset acquisitions within the meaning of Section 7 of the Clayton Act, 15 U.S.C. § 18.

125.     The effect of this acquisition has been to substantially lessen competition and to create or maintain a monopoly in this Relevant Market within the United States in violation Section 7 of the Clayton Act, 15 U.S.C. § 18.

126.     The effect of the acquisition has directly diminished ADS's ability to provide full services to its Commercial Accounts or to engage its customer base, and therefore has impaired, past and future sales and profit opportunities, as well as increased ADS's marginal operating costs and prevented ADS from offering competing products and lower prices to consumers.

127.     Chicago Metro has facilitated this transfer by continuing to provide installation and maintenance of the equipment used in this wireless network.

128.     The District and the Village are immune from antitrust damages under the Local Government Antitrust Immunity Act, 15 U.S.C. §§34-36, and therefore ADS has no adequate remedy at law against the District or the Village.

129.     Unless enjoined immediately, the District's transfer of the fire alarm monitoring business to the Village, and the perpetuation of the monopoly in the Relevant Market, will cause irreparable harm and damage to ADS and the general public, for which ADS and the general public have no adequate remedy at law.

WHEREFORE, Plaintiff moves this Honorable Court for the following relief:

1.     A declaratory judgment that the 2010 Ordinance and the intergovernmental agreement violate ADS's rights under Section 7 of the Clayton Act;

24

2.       An order preliminarily and permanently enjoining the Defendants from engaging in the Business;

3.       An order preliminarily and permanently enjoining the District and Village from transferring the Business from the District to the Village, requiring the District and/or the Village to completely divest themselves from the Business in a manner that will ensure that all private alarm contractors in the Business will be able to freely and openly compete for Commercial Accounts in the Relevant Market and that Commercial Accounts will have the benefits of free competition in their selections of private alarm companies, including ADS, to provide them with the Business;

4.       An award of costs and reasonable attorney's fees as authorized under 15 U.S.C. § 15(a); and,

5.       Such other relief as this Court may deem just and reasonable.

### COUNT IV – VIOLATION OF THE CONTRACT CLAUSE OF THE U.S. CONSTITUTION – (Illegal Government Interference With Private Contracts)

130.     ADS realleges and incorporates by reference paragraphs 1 through 102 as though fully set forth herein.

131.     ADS has a clearly ascertainable right and/or protectable interest in its Customer Contracts with its Commercial Accounts.

132.     ADS's interest in its Customer Contracts, and its right as a licensed private alarm contractor to contract for the sale and leasing of fire alarm equipment, fire alarm services, and fire alarm monitoring constitute property rights protected by Article 1, Section 10 of the U.S. Constitution.

LISLE\152583.1
ID\BLGO - 089112\0999

133.     In order to further and effectuate their anticompetitive goals, the Defendants undertook conduct, agreements, schemes, acts and practices that have interfered with ADS's valid contractual rights with their Customer Contracts and Commercial Accounts or barred ADS for contracting for fire alarm monitoring services even though its Commercial Accounts would freely contract for the Business but for the actions of the District and the Village.

134.     If the District were simply to divest itself of the fire alarm monitoring business, ADS would be able to contract for the Business with its existing Commercial Accounts and contract with new customers for the Business.

135.     In entering into the Business and now entering into an agreement to transfer ownership of the fire alarm monitoring business from the District to the Village, the District and Village, in conjunction with Chicago Metro, have engaged in state action in violation of ADS's constitutional rights which has resulted in ongoing harm to ADS.

136.     By transferring the fire alarm monitoring business from the District to the Village, there is a high probability that all Commercial Accounts will comply with their Subscriber Agreements II and accept the Village as the provider of fire alarm monitoring. The likely effect is that ADS, and other market competitors, would be harmed by the loss of the ability to contract to compete for the Business even though the District intends to exit the Business.

137.     In fact, as a result of the 2010 Ordinance and the transfer of the Business to the Village, ADS suffered harm from the loss of (1) revenue from their existing Commercial Accounts for their Business or other alarm services; (2) referrals from existing customers for new Business; (3) reputation and standing in the commercial community and the interruption of long-standing relationships with their Commercial Accounts and the expectation that these

26

relationships would continue for many years; (4) the ability to sell the Business to new Commercial Accounts and other fire alarm and burglar alarm services as well; and (5) good will.

138.    Even if the District or the Village had the authority to require that all the Commercial Accounts use radio transmitters, the District or Village could have achieved this result by requiring that all Commercial Accounts use radio transmitters or any other methods approved under the NFPA Standards, without interfering with any of ADS's, or other alarm companies, Customer Contracts.

139.    The collective actions of the Defendants in acting to transfer the Business from the District to the Village are actions under color of law within the meaning of the Fourteenth Amendment to the U.S. Constitution.

140.    ADS' constitutional rights under the Contract Clause are fundamental rights for which any deprivation constitutes irreparable injury.

141.    There is no adequate remedy at law to fully and adequately compensate ADS for the damages which it has suffered as a result of the Defendant's violation of the Contract Clause of the United States Constitution.

WHEREFORE, Plaintiff moves this Honorable Court for the following relief:

1.    A declaratory judgment that the Ordinances, Contract, and IGA violate ADS' rights under Article 1, §10 of the U.S. Constitution;

2.    An order preliminarily and permanently enjoining the Defendants from enforcing the 2010 Ordinance or transferring the Business to the Village;

3.    An award of costs and reasonable attorney's fees as authorized under 42 U.S.C. §1988; and,

4.    Such other relief as this Court may deem just and reasonable.

27

## COUNT V – VIOLATION OF ADS'S RIGHTS AS PROTECTED BY THE DUE PROCESS AND EQUAL PROTECTION CLAUSES OF THE U.S. CONSTITUTION
### (Different Treatment of Similarly Situated Entities Under the Color of Law)

142. ADS realleges and incorporates by reference paragraphs 1 through 102 as though fully set forth herein.

143. ADS, as a licensed private alarm contractor, is authorized by the Alarm Act to install and monitor fire alarm and burglar alarm systems anywhere in the State of Illinois, including within the District and the Village.

144. The District and Chicago Metro, in conjunction with the Village, are interfering with and taking away ADS's rights under its license under the State Act to provide fire alarm services, including the Business, to existing Commercial Accounts or offering the Business to prospective customers, which actions are irrational and wholly arbitrary as private alarm contractors are the only ones licensed to provide fire alarm services, including the Business.

145. The District has, and the Village will, be operating as an alarm contractor in contravention of the due process and equal protection provisions of the Fourteenth Amendment to the U.S. Constitution.

146. The District and the Village have been or will be operating the Business without a license under the Alarm Act even though all others engaged in the business as a private alarm contractor are required to be licensed in order to engage in the Business.

147. ADS and other private alarm contractors are being treated differently than the District, Chicago Metro, and the Village as similarly situated entities in violation of the Equal Protection Clause.

LISLE\152583.1
ID\BLGO - 089112\0999

148.    The joint actions of the District and the Village in transferring the District's Business to the Village are actions under color of law within the meaning of the Fourteenth Amendments to the U.S. Constitution, which Chicago Metro has facilitated..

149.    Defendants' joint actions constitute violations of ADS's constitutional rights under the Fourteenth Amendment.

150.    As a result thereof, ADS has suffered harm including loss of: (1) revenue from their existing Commercial Accounts for their Business or alarm services; (2) referrals from existing customers for new Business; (3) reputation and standing in the commercial community and the interruption of long-standing relationships with their Commercial Accounts and the expectation that these relationships would continue for many years; (4) the ability to sell the Business to new Commercial Accounts and other fire alarm and burglar alarm services as well; and (5) good will.

WHEREFORE, Plaintiff moves this Honorable Court for the following relief:

1.    A declaratory judgment that the 2010 Ordinance, the Contract, and the IGA violate the Alarm Companies' rights under the Fourteenth Amendment to the U.S. Constitution;

2.    An order preliminarily and permanently enjoining the Defendants from enforcing the 2010 Ordinance or transferring the District's Business to the Village;

3.    An award of costs and reasonable attorney's fees as authorized under 42 U.S.C. §1988; and,

4.    Such other relief as this Court may deem just and reasonable.

LISLE\152583.1
ID\BLGO - 089112\0999

## COUNT VI-PENDENT CLAIM FOR DECLARATORY JUDGMENT
## THAT NEITHER DISTRICT NOR THE VILLAGE HAVE THE AUTHORITY TO
## ADOPT AND ENFORCE THE ORDINANCES OR THE IGA

130.   Plaintiff incorporates by reference and restates paragraphs 1 through 102 as though more fully set forth herein.

131.   The ADS has a clearly ascertainable right and/or protectable interest in its Customer Contracts with its Commercial Accounts within the District as granted by Article 1, §10 of the U.S. Constitution and under Article 1, §16 of the Illinois Constitution.

132.   The District has no authority under the District Act and the Village has no authority as a municipal corporation to take over the Business from private alarm contractors, and yet both District and the Village are now barring ADS and private alarm companies other than Chicago Metro from the Business.

133.   The District has no authority under the District Act and the Village has no authority as a municipal corporation to effectively subvert the limitations under the District Act on charging residents by having the Village charge all Commercial Accounts in the District Territory for the same service the District is barred by the District Act from providing.

134.   By excluding the ability of private alarm companies to provide fire alarm monitoring to their Commercial Accounts consistent with NFPA Standards, the District has adopted a standard in the Ordinances and IGA that does not parallel the NFPA Standards and thus violates the District Act.

135.   By excluding the ability of private alarm companies to provide fire alarm monitoring to their Commercial Accounts consistent with NFPA Standards even though the Village adopted NFPA Standards, the Village has adopted a standard in the IGA that does not conform to NFPA Standards and thus is acting *ultra vires*.

30

136.    By requiring the installation of radio transmitters by Chicago Metro as established by the Ordinances and IGA and excluding the use of identical radio transmitters or comparable radio transmitters installed by private alarm companies, District and the Village have adopted a standard that does not parallel the NFPA Standards and thus violates the District Act and exceeds the Village's authority.

137.    By engaging in a pattern of behavior that favors the use of radio transmitters owned by the District or the Village and installed and maintained by Chicago Metro over other radio transmitters that are either identical to District's radio transmitters or the functional equivalent under the Ordinances and IGA, indicating a pattern of behavior to deny any licensed alarm company other than Chicago Metro the right to provide radio transmitters or fire alarm monitoring services to Commercial Accounts, even if the alarm companies use the same or comparable equipment as specified in the Ordinances and meet the NFPA Standards District and the Village are adopting a standard that does not parallel the NFPA Standards and thus violates the District Act and exceeds the Village's authority.

138.    ADS will suffer irreparable injury if it is barred from being able to offer its Commercial Accounts the Business or unable to offer the Business to new Commercial Accounts in the District Territory as ADS will lose: (1) revenue from their existing Commercial Accounts for their Business; (2) referrals from existing customers for new Business; (3) reputation and standing in the commercial community and the interruption of long-standing relationships with their Commercial Accounts and the expectation that these relationships would continue for many years; and (4) the ability to sell the Business to new Commercial Accounts and other fire alarm and burglar alarm services as well.

31

139.    There is no adequate remedy at law to fully and adequately compensate ADS, as the denial of a constitutional right constitutes irreparable injury.

WHEREFORE, Plaintiff moves this Honorable Court for the following relief:

1.    A declaratory judgment that the Ordinances and IGA exceed the authority of District and the Village and therefore are unlawful; and,

2.    Such other relief as this Court may deem just and reasonable.

Dated: December 16, 2013

Respectfully submitted,

| | By:  Bruce L. Goldsmith |
|---|---|
| | Bruce L. Goldsmith – ARDC No. 0996939<br>David J. Bressler – ARDC No. 6182549<br>DYKEMA GOSSETT PLLC<br>4200 Commerce Court, Suite 300<br>Lisle, Il  60532<br>630-245-0400<br><br>*Attorneys for Alarm Detection Systems, Inc.* |

32

STATE OF ILLINOIS )
                   ) SS.
COUNTY OF KANE )

### VERIFICATION

ROBERT LUBIC, Vice President of ALARM DETECTION SYSTEMS, INC., being duly sworn on oath states that to the best of his knowledge, the information set forth in the foregoing Supplemental Complaint is true and correct and that he has the authority to make this verification on behalf of himself and ALARM DETECTION SYSTEMS, INC.

_____
Robert Lubic, Vice President
Alarm Detection Systems, Inc.

Subscribed and Sworn to
before me this _13th_ day
of December, 2013.

_____
NOTARY PUBLIC

OFFICIAL SEAL
LINDA S HAMILTON
Notary Public - State of Illinois
My Commission Expires Aug 1, 2015